IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION


MONICA D. MORGAN,                    )
                                     )
                                     )
        v.                           )        No. 1:04-0046
                                     )
MICHAEL J. ASTRUE,[1]                )
Commissioner of Social Security      )


To: The Honorable John T. Nixon, Senior District Judge


**REPORT AND RECOMMENDATION**


The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying the plaintiff's applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided by the Social Security Act.

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff could perform a significant number of jobs in the economy and, therefore, other substantial gainful activity during the relevant time period is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 15) should be denied.

---

[1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of Social Security pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

1

# I. INTRODUCTION

The plaintiff filed an application for DIB and SSI on September 15, 1997, alleging disability beginning October 15, 1996. (Tr. 255-57, 427-29.) The plaintiff alleged the disabling conditions of Ehlers-Danlos Syndrome ("EDS"),[2] asthma, a learning disability, and a broken ankle in 1995. (Tr. 266.) The plaintiff's claim was denied initially and upon reconsideration. (Tr. 223-27, 243, 432, 439.) A hearing was held before Administrative Law Judge ("ALJ") Robert C. Haynes on December 3, 1999. (Tr. 41.) The ALJ delivered an unfavorable decision on January 28, 2000. (Tr. 46-53.) The plaintiff petitioned for a review of that decision before the Appeals Council, and the Appeals Council remanded the case on October 16, 2001. (Tr. 61-64.) The plaintiff's second hearing before ALJ Haynes was held on April 30, 2002. (Tr. 26.) The plaintiff amended her alleged onset date during this hearing to October 11, 1998.[3] (Tr. 524.) The ALJ issued an unfavorable decision on July 9, 2002. (Tr. 17-24.) The Appeals Council denied the plaintiff's request for review of that decision on March 26, 2004 (Tr. 9-11), and the ALJ's decision became the final decision of the Commissioner.

_____

[2] Ehlers-Danlos Syndrome is
> a group of inherited disorders of the connective tissue, occurring in many types based on clinical, genetic, and biochemical evidence, varying in severity from mild to lethal, and transmitted genetically as autosomal recessive, autosomal dominant, or X-linked recessive traits. The major manifestations include hyperextensible skin and joints, easy bruisability, friability of tissue with bleeding and poor wound healing, calcified subcutaneous spheroids and pseudotumors, and cardiovascular, gastrointestinal, orthopedic, and ocular defects.

Dorland's Illustrated Medical Dictionary 1634 (27th ed. 1988) ("Dorland's").

[3] The plaintiff's new alleged onset date coincides with her injury in a motor vehicle accident. (Tr. 411-15, 524.)

2

## II.  BACKGROUND

The plaintiff was born on May 29, 1969, and was 29 years old on October 11, 1998, her alleged onset date. (Tr. 17, 524.)  The plaintiff completed high school with a resource curriculum.[4] (Tr. 355-58.)  The plaintiff's past jobs included work primarily as a fast food worker, but she also spent approximately fifteen months working as a caretaker for mentally impaired individuals. (Tr. 277-82.)

### A. Chronological Background: Procedural Developments and Medical Records

The plaintiff was involved in a motor vehicle accident on October 11, 1998, which resulted in a right distal tibia/ankle fracture and severe skin trauma. (Tr. 411-15, 493.)  Due in part to the plaintiff's EDS, the severe skin trauma eventually necessitated two skin grafts on her lower extremities, and her right ankle fracture was treated with the placement of an external surgical fixator ("external fixator"). (Tr. 134, 411.)    The plaintiff was then transferred from Vanderbilt University Medical Center ("VUMC") to Centennial Hospital ("Centennial") for rehabilitation on October 19, 1998, with physical therapist Dr. Gary Duncan. (Tr. 412.)  On October 28, 1998, the day before the plaintiff was discharged from Centennial, Dr. Duncan noted that the plaintiff had received physical and occupational therapy and wound care treatment, that her vital signs had remained stable, that she could ambulate with the assistance of a walker, and that she was ready to "undergo further skin grafting as well as orthopedic follow-up." (Tr. 411.)

---

[4] The plaintiff's resource curriculum consisted of speech therapy and a resource classroom. (Tr. 358.)

Case 1:04-cv-00046   Document 20   Filed 05/20/09   Page 3 of 31 PageID #: 6

The plaintiff presented to Dr. Ronald Barton at VUMC's "plastic surgery clinic" on October 22, 1998, and he reported a notable improvement in the appearance of her wounds and indicated that she would be a favorable candidate for skin grafts.[5] (Tr. 129.) A nurse examined the plaintiff's right ankle external fixator on October 27, 1998, saw no signs of infection, and found that she could continue a non-weight bearing regimen. (Tr. 128.) Dr. Duncan continued physical therapy with the plaintiff on November 5, 1998, at Centennial, and he noted that she was "doing well without complications" and ready for discharge in thirteen days. (Tr. 415.)

On November 12, 1998, Dr. Barton examined the plaintiff after her successful skin grafting procedure, and opined she had "virtually 100% take of both skin grafts." (Tr. 127.) He reported that her donor site was healing well, advised against trauma to the area, and noted that she could walk with assistance. *Id.* The plaintiff then reported to Dr. Kenneth D. Johnson at VUMC on November 17, 1998, and he observed that she had good sensation and movement in her toes. (Tr 126.) The plaintiff returned to Dr. Johnson on December 14, 1998, and had her external fixator removed (Tr. 123-25). She reported sixteen days later to the postoperative clinic with no significant complaints. (Tr. 121.) The plaintiff's skin grafts continued to heal well and she requested and received a prescription for protective shin guards. (Tr. 120.)

The plaintiff visited Dr. Johnson on March 9, 1999, and he reported that she "really looks quite good" and "has made an excellent recovery from a relatively severe injury." (Tr. 119.) She returned to Dr. Johnson on April 20, 1999, and he noted that she was "doing quite well;" her ankle was able to bear some weight with the assistance of a protective boot and a walker; and "her wounds

---

[5] The plaintiff was still attending rehabilitation sessions at Centennial when Dr. Barton conducted his skin grafting examination. (Tr. 129, 411.)

4

are well healed, and she has only minimal swelling." (Tr. 118.)  Dr. Johnson re-examined the plaintiff on June 15, 1999, and found the plaintiff's swelling "totally gone." (Tr. 117.)  Although the plaintiff experienced pain in her ankle after standing for 20 to 30 minutes, which Dr. Johnson found difficult to evaluate, she exhibited good mid-foot and forefoot motion. *Id.*  Dr. Johnson opined that a portion of her pain might be attributed to the height of the shoes she was wearing, and he suggested that she have an orthotist "build up the sole [of her shoe]" to improve her gait and alleviate some of her discomfort. *Id.*

The plaintiff returned to Dr. Johnson on September 21, 1999, complaining of pain at night, but overall she was "much better" than at her previous visit.  (Tr. 116.)  In order to alleviate some of the pain in the plaintiff's ankle, Dr. Johnson prescribed  "rocker bottom shoes." *Id.*  When the plaintiff returned to Dr. Johnson on December 14, 1999, she had no complaints, her swelling was down, and Dr. Johnson described her as "functioning extremely well." (Tr. 115.)  Dr. Johnson noted that he would only see the plaintiff "on a p.r.n. [as needed] basis." *Id.*  During a March 14, 2000, visit, Dr. Johnson recommended that the plaintiff's interior ankle hardware be removed. (Tr. 114.)  The plaintiff's right tibia and ankle hardware were successfully removed on April 5, 2000. (Tr. 112-113.)  On May 23, 2000, the plaintiff returned to Dr. Johnson for a post-operation visit and he reported that her incision had healed "nicely," that she was "getting along relatively well," and that she could wear "normal shoes with orthotics." (Tr. 111.)  The plaintiff presented to Dr. Johnson on August 15, 2000, with complaints of diffuse ankle pain, but the pain related directly to the hardware had lessened. (Tr. 199.) X-rays also revealed that she "continue[d] to have a solid ankle fusion." *Id.*

On April 13, 1999, the plaintiff presented to Dr. Dana Conner at the Ambulatory Care Center ("ACC") after being hospitalized with a suspected gallstone. (Tr. 142.)  The plaintiff reported doing

Case 1:04-cv-00046   Document 20   Filed 05/20/09   Page 5 of 31 PageID #: 8

well following discharge, with the exception of intense pain radiating from the upper right extremities, which lasted approximately three hours. (Tr. 141.) The plaintiff returned to ACC on February 8, 2000, and February 17, 2000, and she was examined both times by Dr. David Turner. (Tr. 140-41.) Dr. Turner diagnosed her with an ingrown toenail, EDS, and asthma. *Id.* Dr. Conner treated the plaintiff on March 27, 2000, and July 18, 2000, and diagnosed her with EDS and asthma. (Tr. 136-38.)

Dr. Conner examined the plaintiff on October 28, 2000, and diagnosed her with sinusitis and depression. (Tr. 189.) She prescribed Prozac and recommended a follow-up visit in one month. *Id.* The plaintiff returned to Dr. Conner on November 27, 2000, and both she and her parents "could see improvement in her symptoms." (Tr. 188.) The plaintiff also stated that her asthma had improved due to the increased dosage of Accolate. *Id.* On December 28, 2000, Dr. Conner increased the plaintiff's Prozac dosage after she complained of increased stress and tension. (Tr. 187.) The plaintiff denied having any suicidal or homicidal thoughts. *Id.* The plaintiff returned to Dr. Conner on January 11, 2001, for a refill of Prozac. (Tr. 186.) Dr. Conner opined that Prozac "worked well for [the plaintiff]" and that she had no adverse side affects from taking it. *Id.* The plaintiff also revealed that she "has more good days than bad." *Id.*

The plaintiff made four visits to ACC between February 15, 2001, and April 9, 2001, for an ingrown toenail (Tr. 182-85) and she received refills for her asthma and EDS medicines. (Tr. 182.) The plaintiff returned to ACC on September 30, 2001, for a follow-up visit and she was diagnosed with an upper respiratory infection, EDS, and depression. (Tr. 181.)

The plaintiff presented to consulting physician, Dr. Darrel Rinehart, on August 11, 1999, and he noted that she was not receiving therapy for her EDS. (Tr. 418-19.) Dr. Rinehart's evaluation

6

of the plaintiff revealed that she was depressed and had difficulty with mobility, lifting, standing for more than 15 minutes, and sitting for more than 30 minutes. *Id.* Dr. Rinehart re-evaluated the plaintiff on January 3, 2002, and he opined that the plaintiff's "mobility and ability to get around [were] somewhat impaired." (Tr. 201.) She complained of having unsteady gait and stated that she could sit one to two hours, stand five minutes, and lift five to ten pounds. (Tr. 201.) The plaintiff also revealed that she cooked, cleaned, and drove a car. *Id.* Although Dr. Rinehart opined that she could walk without a cane, he explained that she had a "little bit of a broad based gait which appeared to be mild to moderately unsteady." (Tr. 202.) Dr. Rinehart determined the plaintiff could sit, stand, lift, and walk "at low levels maybe intermittently over two or three hours in an 8 hour work day." (Tr. 203.)

On September 19, 2000, Dr. Bruce Davis, a consulting physician, conducted a Spirometric Pulmonary Function Test which revealed a "borderline obstruction" in the plaintiff's breathing. (Tr. 150-52.) He found the plaintiff to have a "slow/unsteady gait" and right ankle swelling. (Tr. 150.) He prescribed an oral inhaler for the plaintiff. *Id.* Dr. Davis also completed a Medical Source Statement of Ability to Do Work-Related Activities ("Medical Source Statement") and determined that she could occasionally lift less than 50 pounds, frequently lift or carry less than 25 pounds, stand/walk for no more than two hours per work day and less than one hour without interruption, and sit for six hours in an eight hour workday. (Tr. 157-58.)

Dr. Louise Patikas conducted a physical residual functional capacity ("RFC") assessment on September 22, 2000 (Tr. 159-66), and opined that the plaintiff could lift/carry 10 pounds frequently and 20 pounds occasionally, stand/walk and sit about six hours in an eight hour day, and that pushing and pulling was limited in her lower extremities. (Tr. 160.) Dr. Patikas noted that the

plaintiff had no manipulative, visual, communicative, or environmental limitations, but that she was occasionally limited with climbing, balancing and crouching, and frequently limited with stooping, kneeling, and crawling. (Tr. 160-65.)

Dr. Deborah E. Doineau, a consulting psychologist, performed two separate psychological evaluations on the plaintiff. The first evaluation occurred on January 27, 1998, and she determined that the plaintiff suffered from post-traumatic stress disorder, avoidant personality syndrome, EDS, and asthma; had an IQ of 80; had mild to moderate limitations in interacting with others; and displayed no significant problems in concentration, memory or persistence. (Tr. 402-06.) Dr. Doineau's second evaluation on January 15, 2002, found the plaintiff to have the same IQ of 80; "clear, coherent, and goal-directed" speech; a "generally euthymic" mood; and to be capable of interacting with others. (Tr. 205-08.) Although the plaintiff complained of suffering from depression, low energy levels, and poor concentration, she was able to cross-stitch, prepare meals, buy groceries, keep appointments, pay bills, and attend church once per week. (Tr. 206.) Dr. Doineau concluded that the plaintiff suffered from dysthymic disorder,[6] was "borderline functionally literate" and capable of interacting with others, understanding instructions, using public transportation, and adapting. (Tr. 208.)

---

[6] Dysthymia is
> a mood disorder characterized by depressed feeling (sad, blue, low, down in the dumps) and loss of interest or pleasure in one's usual activities and in which the associated symptoms have persisted for more than two years but are not severe enough to meet the criteria for major depression.

Dorland's at 521.

Dr. Doineau also completed a mental Medical Source Statement on January 15, 2002. (Tr. 209-10.) Dr. Doineau opined that the plaintiff was slightly restricted in her ability to understand and remember detailed instructions, carry out short/simple and detailed instructions, and interact with the public. *Id.* Dr. Doineau noted that the plaintiff was moderately restricted in her ability to interact with co-workers and deal with work pressures, and markedly restricted in her ability to interact with the public. (Tr. 210.) The plaintiff was not restricted in her ability to understand and remember simple instructions, make judgments regarding simple work-related decisions, or "respond appropriately to changes in a routine work setting." (Tr. 209-10.)

On February 12, 2001, the plaintiff presented to Dr. George Tiller, a geneticist at Vanderbilt, on referral from Dr. Conner. (Tr. 195-96.) Dr. Tiller had previously evaluated the plaintiff following her 1998 motor vehicle accident. (Tr. 195.) The plaintiff complained of multiple joint pain and acknowledged a history of hip and knee pain. *Id.* Dr. Tiller diagnosed the plaintiff with EDS and recommended that she receive "routine medical care" from Dr. Conner and a physical therapy evaluation. (Tr. 196.)

On September 25, 2001, the plaintiff reported to the Maury Regional Hospital ("Maury") complaining of bilateral flank pain.[7] (Tr. 169.) A chest x-ray did not reveal any remarkable findings and lungs were clear and well-expanded. (Tr. 172.) The plaintiff returned to Maury with complaints of migraine headaches on January 24, 2002, and a CT scan revealed left maxillary sinusitis. (Tr. 212-15.) Dr. James Butler opined that the sinusitis could be the cause of the plaintiff's

---

[7] The plaintiff had previously visited Maury Regional Hospital on March 29, 1999, with severe abdominal pain. (Tr. 85-101.) After a series of tests and examination, it was determined that the plaintiff "most likely passed a gallstone," which caused her pancreatitis. (Tr. 86.)

9

headaches, and he found "rather diffuse white matter disease[8] with low attenuation in the white matter of both cerebral hemispheres." (Tr. 214-15.)  On February 13, 2002, the plaintiff presented to Dr. Mary Ellen Clinton, a neurologist, for further evaluation of her January 2002 CT scan. (Tr. 216-19.)  Dr. Clinton noted that the plaintiff had "diffuse CNS white matter disease" which suggested an "underlying demyelinating neuropathy"[9] that is not typical of EDS.  Dr. Clinton also indicated that the plaintiff's multiple skin grafts and severe limp hindered her ability to function physically. (Tr. 218.)  Dr. Clinton concluded that the plaintiff was not "employable." *Id.*

Dr. David Rowe conducted a MRI of the plaintiff's brain on March 29, 2002, and determined that "there is prominent diffuse periventricular white matter change . . . in both cerebral hemispheres" and "mild diffuse left maxillary mucoperiosteal thickening."[10] (Tr. 220.)  On March 29, 2002, Dr. Clinton re-evaluated the plaintiff following the MRI and she deferred making a diagnosis for at least six months because there was no explanation, other than white matter disease, for her head scan abnormalities. (Tr. 221.)  Dr. Clinton also recommended increasing the plaintiff's dosage of Lorazepam to relieve her of headache pain. *Id.*

---

[8] According to Healthline.com, white matter disease affects the myelin that surrounds nerve fibers in the brain.  Myelin insulates the nerve fibers and increases the speed of transmission of all nerve signals.

[9] Demyelinating neuropathy is the "destruction, removal, or loss of the myelin sheath of a nerve or nerves." Dorland's at 443.

[10] Mucoperiosteal thickening is the thickening of the mucus membrane or periosteum. *Id.* at 1059.

10

**B. Hearing Testimony**

On December 3, 1999, the plaintiff had her first hearing before ALJ Haynes. (Tr. 446-83.) The plaintiff testified that she was forced to quit her last job working at Hardee's because of swelling in her legs and pressure from her boyfriend. (Tr. 453.) The plaintiff attributed her swelling to EDS, which she was able to relieve by sitting down or elevating her legs. (Tr. 454.) The plaintiff testified that after her car accident and right ankle fusion surgery, she has been able to walk and put weight on her right ankle with the assistance of a protective boot. (Tr. 456.) She stated that on a normal day she cooks; does some cleaning but takes frequent breaks; watches television for four to five hours; and elevates her leg two or three times a day for about an hour. (Tr. 458-60.) The plaintiff testified that EDS causes severe bruising on her shins, swollen legs, and makes it difficult to move around. (Tr. 461-62.) The plaintiff stated that she lives with her mother, occasionally visits with friends outside of her home, has rarely driven since her automobile accident in October 1998, and was not receiving any psychological or emotional treatment or counseling. (Tr. 465.)

The plaintiff's mother, Linda Carroll, testified that the plaintiff fatigues easily when engaging in exertional activities. (Tr. 474.) Ms. Carroll reported that the plaintiff tried to care for her grandparents (Ms. Carroll's parents) by cooking lunch, washing dishes, and separating and giving medicine to her grandmother. *Id.* Ms. Carroll testified that even though the plaintiff's attempt at caring for her grandparents did not require "a lot of physical activity . . . [it] prove[d] to be way too much for her." (Tr. 475.) The vocational expert ("VE"), Gina Klaus, identified the plaintiff's past work as a fast food worker as "light and semiskilled" and as a personal care giver as "heavy and semiskilled." (Tr. 476.)

11

A second hearing was conducted on April 30, 2002 (Tr. 486-535), before ALJ Haynes, with the express purpose of considering additional evidence in the case.[11] (*See* Tr. 62-64.)  The plaintiff again testified that EDS caused her muscles to weaken, legs to swell, and skin to be hypersensitive to contact. (Tr. 490-91.)  The plaintiff testified that she wore "[a]n ace bandage and shin guards" to protect her right ankle, that she was only able to walk short distances without a cane, and that she suffered from hip pain. (Tr. 493-95.)

The plaintiff stated that she could only stand in one place comfortably for three to five minutes and could only walk five minutes before developing pain.  (Tr. 496.)  On a pain scale of one to ten, the plaintiff placed her average pain at six. (Tr. 497.)  The plaintiff testified that over the last year and a half she had "bad headaches," which caused her to stay in bed. (Tr. 499.)  The plaintiff was taking Lorazepam for her headaches, but she explained that it was not helping her symptoms. (Tr. 500.)

The plaintiff testified that she experienced depression as a result of having EDS and that she "just don't feel like doing anything" during her periods of depression. (Tr. 501.)  She also related problems with her ability to concentrate and focus. (Tr. 501.)  The plaintiff testified that she could drive, clean for 30 to 40 minutes per day, cook simple meals, complete her grocery shopping[12] and laundry, and lives alone. (Tr. 503-04.)  The plaintiff related that leg pain causes her to lie down for

---

[11] The ALJ was specifically directed to determine if the plaintiff had a severe mental impairment, and to consider the duration of her impairment and maximum exertional capacity, and to determine her entitlement to DIB benefits (as opposed to SSI benefits).

[12] When the plaintiff shops for groceries she uses an electric cart to move around the store. (Tr. 504.)

12

one to three hours per day (Tr. 505), and that EDS makes standing difficult and causes her joints to stiffen and ache. (Tr. 506.)

Ms. Carroll testified that the plaintiff frequently uses a cane, has difficulty climbing steps, and bruises easily from even slight contact. (Tr. 509-10.) She revealed that her daughter has poor gripping ability with her hands and experiences pain while sitting. (Tr. 511.) Ms. Carroll also testified that the plaintiff suffered from the presence of headaches, depression, and the inability to deal with stress. (Tr. 513-14.)

Rebecca Williams, the VE, testified that Dr. Patikas's physical RFC (Tr. 159-66) described an individual who could complete a limited range of light work and a full range of sedentary work. (Tr. 518.) After adding extra limitations such as skin breakdown to the description from Dr. Patikas's physical RFC, the VE amended her findings to a limited range of sedentary work. (Tr. 519.) Upon considering Dr. Doineau's medical source statement (Tr. 200-10), the VE testified that the jobs found within a limited range of sedentary work would allow minimal public contact. (Tr. 520.) The VE also opined that if a person were experiencing a decline in functioning and ability to sustain activity that rose to the moderate level, that individual would not be expected to work. (Tr. 521.) The VE explained that a person who needed to prop her leg up on a chair would have limited job opportunities. (Tr. 521-22.) The VE also found hand cramps and severe headaches, as described by the plaintiff, to be additional limitations on job opportunities. (Tr. 522.)

### III. THE ALJ's FINDINGS

The ALJ issued an unfavorable decision on July 9, 2002. (Tr. 17-24.) Based on the record, the ALJ made the following findings:

The claimant met the insured status requirements of the Act as of the alleged disability onset date.

1. The claimant has not engaged in substantial gainful activity since the alleged disability onset date.

2. The claimant has "severe" impairments including Ehlers-Danlos Syndrome, a surgically fused right ankle and a dysthymic disorder.

3. The claimant's impairments, considered individually and in combination, do not meet or equal the severity of requirements of any impairment set forth at 20 CFR Part 404, Subpart P, Appendix One.

4. The claimant's allegations of disabling pain and functional limitations are not credible.

5. The claimant retains the residual functional capacity to lift ten pounds without significant difficulty, stand/walk for two out of eight hours and sit for six out of eight hours, with a need for a sit/stand option allowing change of posture at her discretion, and a need to avoid environments that could easily lead to skin injury as well as those containing excessive pulmonary irritants, as further nonexertionally compromised by a need to avoid significant contact with the general public, as well as moderate limitations in her capacities to interact with co-workers and tolerate work stresses.

6. The claimant cannot perform any past relevant work.

7. The claimant is a younger individual.

8. The claimant has a limited education.

9. The claimant has no transferable work skills.

10. If the claimant could perform the full range of sedentary work, considering the vocational factors of age, education and work experience, a directed conclusion of "not disabled" would result under Rule 201.24, Table One of Appendix Two to Subpart P, 20 CFR Part 404.

11. Although the claimant's nonexertional limitations preclude performance of the full range of sedentary work, using the above-cited Rule as a framework for decision making, a significant number of jobs exist in the national economy which could be performed, considering the residual functional capacity and vocational factors. Examples of such jobs include: assembler; general laborer; and inspector.

14

> 12. The claimant has not been under a disability, within the meaning of the Social Security Act, through the date of this decision.

(Tr. 23-24.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C.A. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support

15

the ALJ's determination. 42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

16

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the

17

medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled.[13] *Id. See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The five step inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the five-step inquiry, and ultimately concluded that the plaintiff was not under a disability as defined by the Act. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since October 11, 1998, the alleged onset date of disability. (Tr. 23.) At step two, the ALJ found that the plaintiff's EDS, surgically fused right ankle, and dysthymic disorder were severe impairments. *Id.* At step three, the ALJ determined that the plaintiff's impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. *Id.* At step four, the ALJ found

---

[13] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

18

that the plaintiff could not return to her past relevant work. *Id.* At step five, the ALJ concluded that although the plaintiff's nonexertional limitations did not allow her to perform the full range of sedentary work, using Medical Vocational Rule 201.24 as framework for his decision making, there were a significant number of jobs in the economy that she could perform. (Tr. 24.)

The effect of this decision was to preclude the plaintiff from DIB and SSI benefits and to find her not disabled, as defined in the Social Security Act, at any time after October 11, 1998, through the date of the decision.

### C. The plaintiff's assertions of error

The plaintiff alleges that the ALJ erred in analyzing the plaintiff's subjective complaints of pain and in assessing the opinions of physicians Dr. Mary Ellen Clinton, Dr. Darrel Rinehart, and Dr. Bruce Davis.[14]

### 1. The ALJ did not err in analyzing the plaintiff's subjective complaints of pain

The plaintiff argues that the ALJ erred in evaluating the credibility of her subjective complaints of pain. The ALJ concluded that the plaintiff's "allegations of disabling pain and functional limitations are not credible." (Tr. 23.)

---

[14] Although the plaintiff did not specifically delineate her assertions of errors, the Court has culled down her primary contentions, and had also considered other arguments made by the plaintiff in her memorandum in support of her motion. The Court agrees with the defendant's analysis that the plaintiff has not challenged the ALJ's findings related to the plaintiff's dysthymic/depression disorder, but rather has focused on her complaints of pain and physical limitations. *See* Docket Entry No. 17, at 12 n. 3. Similarly, the plaintiff did not address her asthma or learning disability (except to mention her "near illiteracy" in context of the plaintiff's daily activities), conditions that she initially listed as disabling conditions.

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision as to credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *See Buxton v. Halter*, 246 F. 3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F. 3d at 1036). Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186 at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at 5. The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. *Id.*

Both the Social Security Administration (SSA) and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[15] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039. The second prong has two

---

[15] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n. 2.

parts: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition, or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

There is objective medical evidence of underlying physical medical conditions: the plaintiff has a surgically fused right ankle and has been diagnosed with EDS. This objective medical evidence satisfies the first prong of the *Duncan* test. Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of her pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's

21

symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[16]

After evaluating the plaintiff's complaints "under the guidelines set forth in the Social Security Regulations at 20 CFR §§ 404.1529 and 416.929," the ALJ determined that the plaintiff's subjective complaints of pain were not credible. (Tr. 19.) The ALJ found that the plaintiff's

> documented range of daily activities is not consistent with the allegations of disability. She testified that she reads, watches television, cross-stitches two or three hours at a time,[[17]] shops, sweeps, cooks, makes beds and does laundry.

*Id.* The ALJ noted that the plaintiff revealed, during a February 13, 2002, office visit with Dr. Clinton, that she had been the caretaker for her grandmother who had ovarian cancer.[18] (Tr. 19,

---

[16] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

[17] The Court agrees with the plaintiff that her testimony at the first hearing before the ALJ does not support the ALJ's conclusion that she cross-stitches two or three hours at a time. *See* Docket Entry No. 16, at 24. In fact, the plaintiff testified that, after 30 minutes to an hour, her hands "cramp up," and she is not able to continue until she has rested for two or three hours. (Tr. 506-07.) This inconsistency between the ALJ's opinion and the plaintiff's testimony is not, however, significant because the plaintiff did testify that she was able to cross-stitch for 30 minutes to an hour at a time.

[18] The plaintiff's mother's testimony at the first hearing before the ALJ appears to corroborate the plaintiff's explanation of her taking care of her grandmother. *See* Docket Entry No. 16, at 24-25. Although Dr. Clinton noted on February 13, 2002, that "[s]ubsequently [the plaintiff] has been the caretaker for her grandmother . . . ."(Tr. 217), Ms. Carroll testified on December 3, 1999, caring for her grandmother "prove[d] to be way too much for [the plaintiff]." (Tr. 475.)

22

217, 270.) The plaintiff also testified that she cleans for 30 to 40 minutes per day and is able to drive. (Tr. 503-04.)

The ALJ then addressed the plaintiff's assertion of disability as a result of her 1998 automobile accident. (Tr. 19.) The plaintiff sustained injuries that required right ankle fusion surgery and skin grafts on both legs. (Tr. 127-28.) Medical notes from November 12, 1998, nearly a month after her accident, revealed that "she has virtually 100% take of both skin grafts" and that her "donor site was healing without problems." (Tr. 127.) The ALJ also noted that on December 14, 1998, two months after the accident, the plaintiff's treating orthopaedist, Dr Johnson, removed the external fixation hardware attached to her right ankle. (Tr. 19, 123-25.) VUMC treatment notes from February 25, 1999, indicate that the plaintiff's skin grafts had healed "very well." (Tr. 120.) Dr. Johnson examined the plaintiff nearly two months later and found that she "looks quite good" and "has no complaints or symptoms." (Tr. 119.) Dr. Johnson further stated that the plaintiff "has made an excellent recovery from a relatively serious injury." *Id.*

The ALJ noted that during the plaintiff's hearing, she testified that she could stand for no more than five minutes. (Tr. 18, 496.) Yet, the plaintiff told Dr. Johnson on June 15, 1999, eight months after her accident, that she could stand unassisted for 20 to 30 minutes before feeling pain in her ankle area. (Tr. 117.) Dr. Johnson opined that the plaintiff's ankle pain could have been caused by the height of her shoes and he recommended that she visit an orthotist to be fitted for a flat soled shoe. *Id.* Dr. Johnson believed that a flatter sole would improve the plaintiff's gait pattern and eliminate some of the discomfort that she had after standing for an extended period of time. *Id.*

When the plaintiff returned to Dr. Johnson for a follow-up visit on September 21, 1999, she had not "advance[d] to a rocker bottom shoe," as he previously recommended, because she had not

had transportation to get to a shoe store. (Tr. 116.) Upon examination, Dr. Johnson found the plaintiff to have "a clinically solid ankle," minimal swelling, and was overall much better than at her previous visit. *Id.* Dr. Johnson examined the plaintiff again on December 14, 1999, and found her to be "functioning extremely well." (Tr. 115.) The plaintiff's internal fixation ankle hardware was removed on April 5, 2000 (Tr. 112-13), and by May 23, 2000, she was doing "relatively well" and wearing "normal shoes with orthotics." (Tr. 111.)

Dr. Johnson's medical opinions are entitled to great weight since he is classified as a treating source under 20 C.F.R. § 404.1502.[19] Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The record clearly indicates that Dr. Johnson had an ongoing treatment relationship with the plaintiff since he examined her on a continual basis over a two year period (Tr. 111-126, 199), and performed two surgical procedures to remove her right ankle's internal and external hardware. (Tr. 112, 123.)

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion

---

[19] A treating source, defined by 20 C.F.R. § 404.1502, is

> your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).

24

of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir.2004). The significant amount of weight the ALJ assigned to Dr. Johnson's medical opinions was clearly supported by objective medical findings, such as the plaintiff's reduced or minimal swelling, lack of joint instability, x-ray evidence of solid right ankle fusion, and properly healing wounds. (Tr. 115-118.)

There is substantial evidence in the record to support the ALJ's finding that plaintiff's subjective complaints of pain did not preclude her from working. Although the ALJ overstated the plaintiff's cross-stitching stamina and ability to care for her grandmother, the record indicates that she engaged in substantial daily activities, did not consistently complain of pain, and recovered steadily from the surgical procedures stemming from her motor vehicle accident. Therefore, the ALJ did not err in finding the plaintiff's subjective complaints of disabling pain were not credible.

**2. The ALJ did not err in assessing the opinions of physicians Dr. Darrel Rinehart, Dr. Bruce Davis, and Dr. Mary Ellen Clinton.**

The plaintiff alleges that the ALJ incorrectly assessed the opinions of Dr. Rinehart, Dr. Davis, and Dr. Clinton. As previously noted, the SSA follows a treating source rule.[20] Social Security regulations require the ALJ to "give good reasons" for disregarding the medical opinion

---

[20] *See supra* at 21.

of a treating physician.[21] 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[22] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).  However, the Sixth Circuit has clarified its holding in *Wilson* by explaining that the good reason requirement of  20 C.F.R. § 404.1527(d)(2) is only applicable to the opinions of treating sources and not to the opinions of other medical sources.[23]

None of these three physicians established "an ongoing treatment relationship" with the plaintiff. *See* 20 C.F.R. § 404.1502.  Dr. Clinton and Dr. Rinehart, a consultative doctor, each examined the plaintiff twice (Tr. 201-02, 216-19, 221-22, 418-19), and Dr. Davis, a consultative physician, examined the plaintiff once. (Tr. 150-58, 216-19.) Thus, each of these three physicians

---

[21] Medical opinions are defined by 20 C.F.R. §§ 404.1527(a) and 416.927(a) as opinions about the nature and severity of an individual's impairment(s) and they are the only opinions that may be entitled to controlling weight. *Atherton v. Astrue*, 2008 WL 4891185, at *10 (M.D. Tenn. Nov. 12, 2008) (Nixon, J.) (citing Soc. Sec. Rul. 96-2p, 1996 WL 374188 at *2). Such opinions must be "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques and "not inconsistent" with the other "substantial evidence" in the individual's case record. *Id.*

[22] The rationale for the "good reason" requirement is to provide the claimant with a better understanding of the reasoning behind the decision and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

[23] *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("Yet even if the purpose of the reasons-giving requirement in 20 C.F.R. § 404.1527(d)(2) applies to the entire regulation, the SSA requires ALJs to give reasons for only *treating* sources.") (emphasis in original).  In *Smith*, the Sixth Circuit explained that since the reason-giving requirement was only found in 20 C.F.R. § 404.1527(d)(2), the subsection dealing with treating physicians, it should not be applied to the entire regulation. *Id.* at 876 ("When an agency includes a requirement in only one section of a regulation, we presume the exclusion from the remainder of the regulation to be intentional."(citing *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983))).

should be categorized as a nontreating physician under 20 C.F.R. § 404.1502.[24]  Given that

categorization, the ALJ is not required to give "good reasons" for assigning less weight to the

findings of Dr. Rinehart, Dr. Davis, and Dr. Clinton.

The ALJ determined that Dr. Rinehart's findings and prescribed limitations were not

supported by objective evidence in the record.  The ALJ explained that

> [t]he medical evidence shows that the [plaintiff's] recovery steadily progressed from
> the date of the October 1998 MVA [motor vehicle accident].  Therefore,
> Dr. Rinehart's observations at the ten month point are not persuasive as to the
> [plaintiff's] sustained residual functional capacity for any period of twelve
> consecutive months.  The medical evidence does not indicate that there were any
> physical functional residuals of the skin grafts twelve months after the accident.

(Tr. 19-20.)  The treatment notes from Dr. Johnson, the plaintiff's treating orthopaedist, indicated

that she was steadily progressing after her accident. (Tr. 111-126, 199.) Dr. Johnson's opinion, as

a treating physician and orthopaedist, is entitled to greater weight under 20 C.F.R. §§ 404.1527(d)

and 416.927(d).  Thus, the ALJ properly afforded more weight to the findings of Dr. Johnson, a

treating physician, and less weight to the findings of Dr. Rinehart, a nontreating physician.

The plaintiff also takes issue with the ALJ's characterization of Dr. Rinehart's January 3,

2002, findings as "essentially benign." (Tr. 20.) *See* Docket Entry No. 16, at 27.  Yet the plaintiff

does not show how Dr. Rinehart's findings support her subjective complaints of pain. *Id.*  The

plaintiff quotes an excerpt of Dr. Rinehart's evaluation, but the excerpt primarily consists of a

superficial description of her healing skin grafts and right ankle operation. *Id.*  Further,

_____

[24] A nontreating source, defined by 20 C.F.R. § 404.1502, is

> a physician, psychologist, or other acceptable medical source who
> has examined you but does not have, or did not have, an ongoing
> treatment relationship with you. The term includes an acceptable
> medical source who is a consultative examiner for us, when the
> consultative examiner is not your treating source.

Case 1:04-cv-00046   Document 20   Filed 05/20/09   Page 27 of 31 PageID #: 30

Dr. Rinehart's evaluation indicated that the plaintiff's primary complaint was her "unsteady gait," and she did not report any complaints of pain. (Tr. 202.) Thus the ALJ correctly determined that the marked physical limitations assessed by Dr. Rinehart were not supported by his own findings or additional medical evidence in the record.

The plaintiff contends that the ALJ ignored Dr. Davis's findings of swelling and lack of movement in the plaintiff's right ankle, two conditions that would be reasonably expected to produce pain. (Docket Entry No. 16, at 27.) However, the physical limitations set forth in Dr. Davis's medical source statement do not suggest the plaintiff was suffering from debilitating pain. (Tr. 157-58.) In fact, the ALJ found Dr. Davis's limitations to be "too optimistic" and prescribed a range of restrictions that relegated the plaintiff to a more "limited range of sedentary exertion." (Tr. 21.) The ALJ clearly did not ignore Dr. Davis's findings.

The plaintiff also argues that the ALJ erred in rejecting Dr. Clinton's opinion regarding the severity of her symptoms. The plaintiff presented to Dr. Clinton on February 13, 2002, for an abnormal head scan and she found diffuse CNS white matter that suggested "an underlying demyelinating neuropathy." (Tr. 218.) Dr. Clinton also noted that the plaintiff

> suffers very badly from complications of Ehlos-Danlos [sic] syndrome. Minimum skin trauma results in the need for skin grafts. She has got multiple skin grafts on her legs and has a fused right ankle. She is walking with a severe limp. This a great hindrance to her physical functioning. Furthermore, she presents a severe hazard at any work place as a minimum trauma might result in multiple hospitalizations and skin grafts.

> For this reason, it appears that she is not employable.

*Id.* The ALJ found Dr. Clinton's opinion that the plaintiff was "not employable" to be a vocational judgment that she was "not qualified to render." *Id. See also* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Although Dr. Clinton concluded that the plaintiff would be a "severe hazard at any

28

work place [because] minimum trauma might result in multiple hospitalizations and skin grafts" (Tr. 218), the VE testified that even if the plaintiff were limited from working in environments where she might easily "bump[] against things," which could cause her skin to break down or tear, she would not be precluded from performing sedentary jobs. (Tr. 517-20.) Even though the ALJ focused on Dr. Clinton's findings addressing the plaintiff's head pain, it is clear that he also considered her evaluation of the plaintiff's other physical ailments.

Although the ALJ is also not required to provide "good reason" for the weight he afforded the opinion of a nontreating physician, such as Dr. Clinton, it is evident that the ALJ did afford Dr. Clinton's evaluations some weight. *Smith*, 482 F.3d at 876. The ALJ supported his conclusion that the plaintiff did not suffer from a "severe impairment of headaches" by noting that "[Dr. Clinton's] treatment records, the weight of the medical evidence and the documented daily activities indicate that the [plaintiff] experiences intermittent head pain that responds well to medications and does not result in any significant functional limitations on a sustained basis." (Tr. 20.) Given that the plaintiff was referred to Dr. Clinton, a neurologist, for an abnormal head scan, and that Dr. Clinton's treatment notes primarily focus on her head examinations and headaches (Tr. 216-19, 221-22), it was reasonable for the ALJ to concentrate on those findings. (Tr. 20.)

### 3. The plaintiff's additional assertions of error

The plaintiff argues that the ALJ erred by not specifically addressing Dr. Tiller's recommendation that the plaintiff should be referred to a chronic pain clinic. (Docket Entry No. 16, at 26.) Dr. Tiller, a geneticist, examined the plaintiff once on referral. (Tr. 195-96.) The plaintiff made subjective complaints to Dr. Tiller and he opined that "she seems to require chronic pain

management, and this may best be addressed in a clinic specializing in the care of such patients."
(Tr. 196.)  Dr. Tiller's examination notes indicate that he found no obvious deformities of her
extremities and that he did not investigate her joint motion carefully. (Tr. 195.)  Furthermore, "[a]n
ALJ can consider all the evidence without directly addressing in his written decision every piece of
evidence submitted by a party.  Nor must an ALJ make explicit credibility findings as to each bit
of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved
such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 507-08 (6th Cir. Feb. 9,
2006) (quoting  *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir.1999)).  Dr.
Tiller's evaluation did not offer any additional information regarding the severity of the plaintiff's
symptoms or need for treatment that the ALJ could not have gleaned from the medical reports that
he specifically addressed in his decision.

      The plaintiff also contends that the ALJ should have specifically addressed Dr. Johnson's
August 15, 2000, treatment note, revealing that the plaintiff complained of diffuse pain. (Docket
Entry No. 16, at 26.)  However, the plaintiff acknowledged that the pain "directly related to the
hardware is better," and that "x-rays revealed no shift in position of her nail," and that her ankle
fusion was solid. (Tr. 199.)  Dr. Johnson apparently did not find the plaintiff's complaints of diffuse
pain symptoms to be significant since his treatment plan only consisted of periodically following
up with her. (Tr. 199.)  The ALJ did not err in not specifically addressing this medical report because
it does not provide any additional support for the plaintiff's complaints of disabling pain.

30

## V. RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 15) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge

31